NO. 16-10109

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

      Petitioner-Appellant,

  v.

ALFONZO WILLIAMS, *et al.,*

      Defendants-Appellees.

_____/

On Appeal from the United States District Court
for the Northern District of California
No. 13-CR-00764-WHO
The Honorable William H. Orrick, Judge

**DEFENDANTS-APPELLEES' BRIEF**

MARK GOLDROSEN
California State Bar No. 101731
255 Kansas Street, Suite 340
San Francisco, CA 94103
Telephone: (415) 565-9600
Facsimile: (415) 565-9601

Attorney for Defendant-Appellee
ANTONIO GILTON

## TABLE OF CONTENTS

**Page**

JURISDICTION AND TIMELINESS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ISSUES PRESENTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     I.    Search Warrant for Gilton's CSLI. . . . . . . . . . . . . . . . . . . . . . . . . . 2

     II.    Pending Charges. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

     III.    Gilton's Motion to Suppress. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

     IV.    The District Court's Order. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

     I.    The District Court Correctly Suppressed Gilton's Historical CSLI
Because Gilton Had a Reasonable Expectation of Privacy in this Data
and the Search Warrant Was So Lacking in Probable Cause That the
Police Were Unreasonable to Rely on it. . . . . . . . . . . . . . . . . . . . . . 12

        A.    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        B.    Gilton Had a Reasonable Expectation of Privacy in His
Historical CSLI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        C.    The Government's Acquisition of CSLI Must Be Supported by
Probable Cause, Not Merely a Showing of Reasonable
Relevance to an Investigation. . . . . . . . . . . . . . . . . . . . . . . . . 26

        D.    The Affidavit in Support of the Warrant  Did Not Establish a

Reasonable Nexus Between the Homicide and Gilton's CSLI.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
     1.    Appropriate Deference.. . . . . . . . . . . . . . . . . . . 28
     2.    The District Court did not Ignore Information
          Contained in the Supporting Affidavit.. . . . . . . 29
     3.    The District Court Did Not Apply an Incorrect
          Standard When Reviewing the Supporting
          Affidavit.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

E.    The Affidavit in Support of the Warrant Was So Lacking in
       Indicia of Probable Cause That Reliance on the Warrant by the
       Police Was Not in Good Faith... . . . . . . . . . . . . . . . . . . . . . . . 34

CONCLUSION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

STATEMENT OF RELATED CASES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

CERTIFICATE OF COMPLIANCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

# TABLE OF AUTHORITIES

**Page**

## CASES

*Arizona v. Gant*, 556 U.S. 332 (2009).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*City of Indianapolis v. Edmond*, 531 U.S. 32 (2000). . . . . . . . . . . . . . . . . . . . . . 27

*City of Los Angeles v. Patel*, 135 S. Ct. 2443 (2015). . . . . . . . . . . . . . . . . . . . . . 26

*City of Ontario v. Quon*, 560 U.S. 746 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Compare Maryland v. King*, 133 S.Ct. 1958 (2013).. . . . . . . . . . . . . . . . . . . . . . 27

*Compare Samson v. California*, 547 U.S. 843 (2006). . . . . . . . . . . . . . . . . . . . . . 27

*Illinois v. Gates*, 462 U.S. 213 (1983).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

*In re Application of U.S. for an Order Authorizing Release of Historical Cell-Site Info*, 809 F.Supp. 2d 113 (E.D.N.Y. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*In re Application of U.S. for an Order Directing a Provider of Elec. Commc'n Serv. to Disclose Records to Gov't*, 620 F.3d 304  (3d Cir.2010). . . . . . . . . . . . 17

*In re U.S. for Historical Cell Site Data*, 724 F.3d 600 (5th Cir. 2013). . . . . . 17, 20

*In re: Application for Telephone Information Needed for a Criminal Investigation*, 119 F.Supp.3d 1011 (N.D. Cal. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . Passim

*Riley v. California*, 134 S.Ct. 2473 (2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Smith v. Maryland*, 442 U.S. 735 (1979). . . . . . . . . . . . . . . . . . . . . . . . 7, 11, 15-17

*United States v. Alvarez*, No. 14-cr-00120-EMC, 2016 WL 3163005. . . . . . . . . . 12

*United States v. Carpenter*, 819 F.3d 880 (6th Cir. 2016). . . . . . . . . . . . . . . . 19, 20

*United States v. Cooper*, No. 13-cr-00693-SI, 2015 WL 881578. . . . . . . . . 8, 9, 12

*United States v. Davis*, 785 F.3d 498 (11th Cir. 2015). . . . . . . . . . . . . 17, 18, 20, 21

*United States v. Graham*, 824 F.3d 421 (4th Cir. 2016). . . . . . . . . . . 19, 20, 25, 27

*United States v. Grant*, 682 F.3d 827 (9th Cir. 2012). . . . . . . . . . . . . . . . . . 35, 36

*United States v. Jones*, 132 S.Ct. 945 (2012). . . . . . . . . . . . . . . . . . . . . . . 13, 14, 22

*United States v. Karo*, 468 U.S. 705 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Knotts*, 460 U.S. 276 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Krupa*, 658 F.3d 1174 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . 29

*United States v. Leon*, 468 U.S. 897 (1984). . . . . . . . . . . . . . . . . . . . . . . . . Passim

*United States v. Miller*, 425 U.S. 435 (1976). . . . . . . . . . . . . . . . . . . . . . . . Passim

*United States v. Underwood*, 725 F.3d 1076 (9th Cir. 2013). . . . . . . . . . . . . . . . . 33

*Vernonia School Dist. 47J v. Acton*, 515 U.S. 646 (1995). . . . . . . . . . . . . . . . . . . 27

## **CONSTITUTIONAL PROVISIONS**

U.S. Const., Fourth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Passim

## **STATUTES**

18 U.S.C. § 924(c)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

18 U.S.C. § 924(j) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 11

18 U.S.C. § 1959(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

18 U.S.C. § 1962(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

18 U.S.C. § 2703(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

COURT OF APPEALS NO. 16-10109

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

          Petitioner-Appellant,

v.

ALFONZO WILLIAMS, *et al.*,

          Defendants-Appellees.

_____/

## JURISDICTION AND TIMELINESS

Gilton agrees with the government's statement regarding jurisdiction, timeliness, and bail status.

## ISSUES PRESENTED

1.      Did the district court correctly rule that Gilton had a reasonable expectation of privacy in the historical cell-site location information (hereafter CSLI) acquired from the records of his cellular service provider, which were generated even in the absence of user interaction with the cellular phone?

2.      Did the district court correctly rule that the affidavit in support of the search warrant for Gilton's CSLI lacked probable cause to believe that evidence of

a crime would be found in such records?

3.     Did the district court correctly rule that the search warrant affidavit was so lacking in probable cause that reliance on the warrant was not in good faith under *United States v. Leon*, 468 U.S. 897, 923 (1984)?

## STATEMENT OF THE CASE

### I.    Search Warrant for Gilton's CSLI

On June 6, 2012, the state court judge issued a warrant for the seizure of information related to two cellular telephones. One of the telephones, (414) 202-7921, belonged to Antonio Gilton and was used by him. The warrant, directed to Sprint, allowed for the seizure of "[s]ubscriber and billing information, all incoming and outgoing SMS Text messages or phone numbers sent or received from 5/1/12 and 6/6/12, all CDMA and AMA data, [and] cell site tower locations for those cellular telephone numbers." ER 411.

The unredacted portion of the supporting affidavit, authored by San Francisco Police Sergeant Gary Watts, set forth the following circumstances. On June 4, 2012, at approximately 2:00 a.m., a witness reported to SFPD Dispatch that he/she heard three to four gunshots and saw a silver colored SUV driving away from Meade and Le Conte Avenues, San Francisco. Officers responding to that location found Calvin Sneed dead in the driver's seat of a Toyota Corolla.

2

Sneed had a gunshot wound to his head.  Standing next to the car was Sneed's girlfriend, L.G.  ER 414-15.

L.G. told the police that approximately eight months before the shooting she moved from San Francisco to Los Angeles for a "new start."  In Los Angeles, she lived with her "elder brother."[1]  Approximately four months after moving she met Calvin Sneed, whom she later learned was pimping young females for prostitution in the Los Angeles area.  L.G. soon began to advertise herself as a prostitute on various web sites.

According to L.G., on May 31, 2012, her mother came to Los Angeles in the hope of persuading her to return to San Francisco.  ER 415.  Her mother soon returned alone to San Francisco.  On June 3, 2012, L.G. and Sneed drove from Los Angeles to San Francisco.  At about 4:00 p.m.,  L.G. went to her parents' house on Jennings Court.

L.G. then went with her parents to visit her grandmother in an East Bay hospital and returned to her parents' house at about 12:15 a.m. on June 4, 2012.  She then argued with her mother about returning to Los Angeles and sent Sneed a text message, asking to be picked up.  At approximately 1:49 a.m., L.G. sent

---

[1]The person L.G. referred to as her "elder brother" was Gilton.  However, Gilton is actually her older cousin, not her "brother."

3

another text message to Sneed with the address of her parents' home. Seven minutes later Sneed texted her to come outside. Once outside, L.G. noticed a mid-size silver SUV parked nearby with its lights on. Sneed drove past where L.G. was standing and the SUV accelerated up to his car. L.G. heard gunshots and saw a muzzle flash coming from the SUV. She then heard a crash and ran up to Sneed's car, finding him slumped in the driver's seat with a gunshot wound to his head. ER 416.

Later, during the afternoon of June 4, 2012, Inspector Jones spoke on the telephone with L.G.'s father, Barry Gilton, who agreed to meet with the inspector at the Hall of Justice. ER 417. Shortly thereafter, an attorney called the inspector to inform him that Barry Gilton would not be making a statement to the police.

On June 5, 2012, the police viewed a video recording retrieved from a house near where the killing occurred. The video showed that at approximately 2:00 a.m. on June 4, 2012, a vehicle was waiting at the west end of Le Conte and Jennings Streets. Moments later another vehicle traveled southbound on Jennings Street headed for the intersection of Meade Avenue and Jennings Court. The vehicle that had been waiting turned and followed the other vehicle. About a minute later, a light colored mid-size SUV drove west on Le Conte Street and then turned north on 3rd Street. ER 418. Inspector Jones and Sergeant Watts believed

4

that the SUV depicted in the video was the vehicle involved in the shooting.

L.G. gave the police permission to search her cell phone. During the search the police discovered the cell phone numbers for L.G.'s father (Barry Gilton), mother (Lupe Mercado), "elder brother" (Antonio Gilton), and younger brother. L.G. identified her "elder brother's" number as (424) 202-7921.

The police obtained call log and cell tower data for Barry Gilton's cell phone. This information indicated that at about 12:49 a.m. on June 4, 2012, his phone was located near the family residence on Jennings Court. The cell phone then traveled north through San Francisco and at approximately 1:15 a.m. it was in the Western Addition. At approximately 1:30 a.m., the cell phone again hit off towers near the family residence and continued to do so until 1:57 a.m. At approximately 2:19 a.m., the father's cell phone traveled north in San Francisco and hit a tower in the northern area of the Mission district. The cell phone data appeared to contradict Barry Gilton's statement to one of the officers who responded to the scene of the shooting. Barry Gilton allegedly told the officer that he had been home since 12:15 a.m. ER 419.

At the conclusion of the search warrant affidavit, Sergeant Watts wrote that "there appears to be probable cause to believe that the cell phone numbers provided will tend to show has [sic] possible first-hand knowledge of those

persons responsible for the shooting of the [sic] Calvin Sneed that took place in San Francisco on 12/20/11 [sic]." ER 419. In addition, "the results of the subscriber identity information, all ingoing and outgoing calls, all text messages sent and received, the CDMA and AMA data and the cell site tower locations used on the date and times listed could possibly lead to the proper identity and the whereabouts of additional persons associated with this crime." ER 419-20

## II. Pending Charges

Gilton was initially charged in state court and then indicted by a federal grand jury on November 21, 2013. A second superseding indictment filed on April 14, 2014 charges 11 defendants and 22 counts. ER 255-84. Gilton is charged in Counts One (conspiracy to conduct the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d)), Two (murder of Calvin Sneed in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1)), Three (use, possession, brandishing, or discharge of firearm in furtherance of crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)) and Four (use or possession of a firearm in a murder in violation of 18 U.S.C. § 924(j)). ER 260-69.

Trial will commence sometime after this appeal is decided.

III.   **Gilton's Motion to Suppress**

On November 10, 2015, Gilton filed his motion to suppress the CSLI obtained by the San Francisco police through the execution of a search warrant at Sprint, Gilton's cellular service provider.  The motion argued that the affidavit in support of the search was "so lacking in probable cause" that reliance on the warrant was not in good faith under *Leon*.  The affidavit failed to establish any nexus between Gilton or his cell phone data and the Sneed homicide.  Nothing in the affidavit suggested that Gilton shot Sneed, was present when Sneed was shot, or had information in his cell phone records and data relevant to the crime.  ER 251-254.

In its opposition brief, the government argued that a warrant to obtain the CSLI was unnecessary because Gilton did not have a reasonable expectation of privacy in the data.  According to the government, the CSLI was the business record of Gilton's cell phone provider.  That record contained information voluntarily conveyed to the provider by Gilton, and therefore was not protected by the Fourth Amendment.  The government relied upon the third-party doctrine set forth in *United States v. Miller*, 425 U.S. 435 (1976) and *Smith v. Maryland*, 442 U.S. 735 (1979).   ER 237-42.

In the alternative, the government argued that the warrant for Gilton's phone

7

records was supported by probable cause. According to the government, the murder was likely committed by a family member of L.G. and, since Gilton was related to her, it was reasonable to infer that information contained in Gilton's phone would lead to the identity and whereabouts of other persons involved in the crime. ER 242-43. The government also argued that the police relied in good faith on the search warrant because there was a colorable argument for probable cause. ER 243-45.

In his reply brief, Gilton urged the district court to follow the recent decisions of two courts in the Northern District of California, which held that individuals have a reasonable expectation of privacy in the CSLI records kept by their cellular service providers. *In re: Application for Telephone Information Needed for a Criminal Investigation*, 119 F.Supp.3d 1011 (N.D. Cal. 2015) and *United States v. Cooper*, No. 13-cr-00693-SI, 2015 WL 881578. In *Tel. Info.*, Judge Koh explained that the third-party doctrine does not apply because a cell phone generates CSLI even in the absence of user interaction with the device – by receiving unanswered calls and texts, continuous operation of apps, and automatic pinging when scanning the network. ER 218-22.

Gilton's reply also refuted the government's claim that probable cause existed because of the family connection to the murder. The warrant affidavit

8

contained specific information about the family member allegedly involved in the shooting and that person was not Antonio Gilton. Nor did the affidavit indicate that Gilton had any connection to the "family home" near where the homicide took place, that he was in San Francisco at the time of the killing, or that he had any communications with other family members about killing Sneed. ER 222-23. Finally, Gilton argued that the absence of good faith reliance on the magistrate judge's issuance of the warrant was evident from the failure of the sergeant who authored the affidavit to affirmatively state that probable cause existed. ER 224-225.[2]

## IV. The District Court's Order

On February 9, 2016, the district court granted Gilton's motion to suppress his CSLI. The district court found that Gilton had a reasonable expectation of privacy in the historical CSLI obtained under the warrant. ER 5. In reaching this conclusion, the district court was persuaded by the reasoning of the two district court decisions cited by Gilton, *Tel. Info,*, 119 F.Supp.3d 1011 and *Cooper*, 2015 WL 88578. Like these courts, the district court was concerned about:

the ubiquitous nature of cell phones in modern life, the enormous

---

[2]In supplemental briefing, the government argued that the CSLI would have been inevitably discovered and was therefore admissible. The district court rejected the argument and the government abandoned it in this appeal.

9

amount of personal information contained in them, the ability to determine a phone-owner's physical location even when not on the phone, and the likelihood that calls will be made from a user's home, where an individual's reasonable expectation of privacy is especially acute.

ER 0193.

After finding that Gilton had a reasonable expectation of privacy in his historical CSLI, the district court considered whether the search warrant was supported by probable cause. It concluded that "[t]he affidavit in support of the Sprint warrant plainly failed to provide a substantial basis for concluding that there was probable cause to search." ER 5. The district court explained that the affidavit "hardly mention[ed] Gilton," and did not provide a substantial basis for inferring that Gilton was in the San Francisco area at the time of the shooting. *Id*. Moreover, to the extent the affidavit suggested a "family-based attack," it pointed to a family member other than Gilton. ER 6. Nor was "there an opinion from an investigating officer stating that, based on his or her experience in similar cases, he or she believed that evidence of the homicide would be found in A. Gilton's cell phone data." ER 7.

Finally, the district court concluded that the *Leon* "good faith" exception did not apply. "[I]t was 'entirely unreasonable' to believe that the affidavit's passing, innocuous references to A. Gilton established probable cause to obtain his cell

10

phone data." ER 8. Accordingly, the district court granted Gilton's motion to suppress evidence.

## SUMMARY OF ARGUMENT

This Court should affirm the district court's order suppressing Gilton's historical CSLI data, obtained by a search warrant not supported by probable cause. Gilton had a reasonable expectation of privacy in the location information associated with his cell phone. *Tel. Info.*, 119 F.Supp.3d 1011. CSLI generated by a cell phone can reveal a wealth of information about an individual, including one's physical location inside a home.

The third-party doctrine articulated in *Miller*, 425 U.S. 435 and *Smith*, 442 U.S. 735 does not dictate otherwise because cell phone users do not voluntarily convey their location to their cellular service provider. CSLI is generated even in the absence of user interaction with the phone; when an incoming call or text is not answered, applications are running in the background, or the phone is scanning the network.

The obtaining of CSLI by law enforcement is a search under the Fourth Amendment, and therefore a warrant supported by probable cause is required. Here, the affidavit did not provide a substantial basis for concluding that probable cause existed. It contained only passing, innocuous references to Gilton: that L.G.

11

lived with him in Los Angeles and that his phone number was one of those in her cell phone. The affidavit provided no nexus between the Sneed homicide and information relating to Gilton's CSLI. Moreover, the affidavit was so lacking in indicia of probable cause that reliance on the warrant by the San Francisco police was not in good faith. *Leon*'s good-faith exception is therefore not applicable, and Gilton's CSLI must be suppressed.

**ARGUMENT**

**I.     The District Court Correctly Suppressed Gilton's Historical CSLI Because Gilton Had a Reasonable Expectation of Privacy in this Data and the Search Warrant Was So Lacking in Probable Cause That the Police Were Unreasonable to Rely on it.**

### A.     Standard of Review.

Gilton agrees with the standard of review set forth by the government. AOB. at 21.

### B.     Gilton Had a Reasonable Expectation of Privacy in His Historical CSLI.

Neither the Supreme Court nor this Court has held that a defendant lacks a reasonable expectation of privacy in his historical CSLI. Moreover, in addition to the district court below, at least four other Northern District of California cases have recently rejected the government's argument. *See Tel. Info.*, 119 F.Supp.3d 1011, 1026; *Cooper*, 2015 WL 881578 at *8; *United States v. Alvarez*, No. 14-cr-

00120-EMC, 2016 WL 3163005 at *3; *In re Application for Telephone Information Needed for a Criminal Investigation*, No. 15-xr-90304-HRL, Doc. 2 at 4-5. In its brief, the government mostly ignores the rulings made by these district courts. It also fails to make a convincing argument that these cases were wrongly decided.

*Tel. Info.* contains the most thorough analysis of the issue. Judge Koh began her opinion by reviewing Supreme Court cases addressing either electronic surveillance or the contents of cell phones, including: *United States v. Knotts*, 460 U.S. 276, 281 (1983) (using beeper to track vehicle's movements on public roads did not implicate the Fourth Amendment because person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another); *United States v. Karo*, 468 U.S. 705, 8714-715 (1984) (placing a beeper in the defendant's container and then monitoring it inside the defendant's home violated the Fourth Amendment even though the officer could not have known, when they planted the tracking device, that it would end up inside a house); *United States v. Jones*, —U.S. —, 132 S.Ct. 945, 955 (2012) (installing a GPS tracking device on the defendant's car and using it to monitor the car's location on public roads for 28 days violated the Fourth Amendment); and *Riley v. California*, —U.S. —, 134 S.Ct. 2473, 2490 (2014)

13

(warrantless search of defendant's cell phone violated the Fourth Amendment).

Based on her review of these Supreme Court cases, Judge Koh found that the following principles were manifest:

> 1) an individual's expectation of privacy is at its pinnacle when government surveillance intrudes on the home; (2) long-term electronic surveillance by the government implicates an individual's expectation of privacy; and (3) location data generated by cell phones, which are ubiquitous in this day and age, can reveal a wealth of private information about an individual. Applying those principles to the information sought here by the government, the Court finds that individuals have an expectation of privacy in the historical CSLI associated with their cell phones, and that such an expectation is one that society is willing to recognize as reasonable.

*Tel. Info*. at 1022. In support of this conclusion, the district court noted that obtaining a defendant's historical CSLI is "arguably more intrusive than the GPS device attached to the defendant's car in *Jones*." *Id*. at 1023. A defendant is likely to take his cell phone into constitutionally protected areas, such as his home, when tracking occurs over a long period of time.[3] In addition, compared to GPS tracking of a car, the government will get more data from historical CSLI since "unlike the vehicle in *Jones*, cell phones typically accompany the user wherever she goes." *Id*. Moreover, with advancements in technology, "the government is

---

[3]Here, the warrant obtained historical CSLI from May 1, 2012 to June 6, 2012. ER 411. It is certainly likely that Gilton had his cell phone at his home and in other constitutionally protected areas during this 37-day period.

able to use historical CSLI to track an individual's past whereabouts with ever increasing precision." *Id*. at 1023.

*Tel. Info.*'s finding that individuals harbor a subjective expectation of privacy in historical CSLI was supported by survey data compiled by researchers. *Id*. at 1024-25. The reasonableness of this expectation was demonstrated to Judge Koh's satisfaction "by the myriad state statutes and cases suggesting that cell phone users 'can claim a justifiable, a reasonable, or a legitimate expectation of privacy,' in this kind of information." *Id*. at 1025. Judge Koh noted in particular that "it has been [California] law for more than three decades that police need a warrant to obtain telephone records." *Id*.

Here, the government argues that the third-party doctrine articulated in *Miller*, 425 U.S. 435 and *Smith*, 442 U.S. 735 precludes a finding that Gilton had a reasonable expectation of privacy in his historical cell site location information. AOB. at 27-36. Pursuant to this doctrine, "the Fourth Amendment does not prohibit the obtaining of information  revealed to a third party and conveyed by him to Government authorities . . . ." *Miller*, 425 U.S. 443. *Miller* involved the government's subpoena of a defendant's bank records, while *Smith* involved the use of a pen register to obtain the telephone numbers dialed by the target telephone.

The government's argument was considered and persuasively rejected in *Tel. Info*. As Judge Koh explained, "the third-party doctrine applies when an individual has 'voluntarily conveyed' to a third party the information that the government later obtains." *Id*. at 1027. "Cell phone users, by contrast do not 'voluntarily convey' their location to the cellular service provider in the manner contemplated by *Miller* and *Smith*." *Id*. This is true because a cell phone generates site location information even in the absence of user interaction with the device. Such information will be generated by unwanted, incoming call and texts that are not answered and by applications, such as email, that continually run in the background. In addition, a cell phone is always scanning its network's cellular environment, resulting in the "pinging" of nearby cell towers every seven to nine minutes.[4] *Id*. at 1028

*Tel. Info.*, thus concluded:

> that historical CSLI generated via continuously operating apps or automatic pinging does not amount to a voluntary conveyance of the user's location twenty-four hours a day for sixty days. Such data, it is clear, may be generated with far less intent, awareness, or affirmative conduct on the part of the user than what was at issue in *Miller* and

---

[4]The record in *Tel. Info.* did not establish that every cell service provider recorded site location information generated by the cell phone scanning the network environment. Sprint, however, was one that did. *Id*. at 1028. Sprint was the cell service provider for Gilton's phone and the company to which the search warrant was directed. ER 420.

> *Smith*. Unlike the depositor in *Miller* who affirmatively conveyed checks and deposit slips to the bank, or the telephone user in *Smith* who affirmatively dialed the numbers recorded by the pen register, a cell phone user may generate historical CSLI simply because her phone is on and without committing any affirmative act or knowledge that CSLI is being generated. *Smith*, for example, never contemplated the disclosure of information while the landline telephone was not even in use.

*Id*. at 1029. The same conclusion was reached by the Third Circuit, rejecting the government's argument that *Miller* and *Smith* precluded magistrate judges from requiring a warrant supported by probable cause to obtain historical CSLI. *In re Application of U.S. for an Order Directing a Provider of Elec. Commc'n Serv. to Disclose Records to Gov't*, 620 F.3d 304, 317-318 (3d Cir.2010). "A cell phone customer has not 'voluntarily' shared his location information with a cellular provider in any meaningful way." *Id*. at 317.

In *Tel. Info.*, Judge Koh also gave careful consideration to contrary decisions made by the Fifth Circuit in *In re U.S. for Historical Cell Site Data*, 724 F.3d 600, 612 (5th Cir. 2013) and the Eleventh Circuit in *United States v. Davis*, 785 F.3d 498, 511 (11th Cir. 2015) (en banc). These opinions were found to be distinguishable due to material differences in the factual record. *Tel. Info.*, 119 F.Supp.3d at 1031-33.

As Judge Koh explained, both the Fifth and Eleventh Circuit cases

"involved technology from 2010 and were expressly limited to instances where a cell phone user was either making or receiving a call." *Id*. at 1031.[5] The factual record in those cases, unlike in *Tel. Info.*, did not include the additional information that historical CSLI would be generated even in the absence of user interaction with the cellular phone – by the receipt of a call or text that was not answered, continuous operation of applications such as email, and automatic pinging when scanning the network. *Id*. at 1039. Indeed, the Fifth Circuit decision only contemplated circumstances where the cell phone user actually made a call. *Id*. at 1031. Thus, the holdings of the Fifth and Eleventh Circuit cases that cell phone users voluntarily convey cell tower location information to telephone companies when making and receiving calls on their cell phones was too narrow for the factual record developed before the district court in *Tel. Info.* Accordingly, *Tel. Info.* found that its ruling was "not at odds with the Fifth and Eleventh Circuits."[6] *Id*. at 1032.

_____

[5]As explained in Judge Jordan's concurrence, the majority opinion in *Davis* was "limit[ed] to the world (and technology) as we knew it in 2010." *Davis* at 521 (J. Jordan, concurring).

[6]Another district court concluded that there is a reasonable expectation of privacy in historical CSLI based on a different reason than articulated in *Tel. Info*. In *In re Application of U.S. for an Order Authorizing Release of Historical Cell-Site Info*, 809 F.Supp. 2d 113, 126 (E.D.N.Y. 2011), the district court held that "cumulative cell-site-location records implicate sufficiently serious protected

In its opening brief, the government relies on two opinions from other circuits decided subsequent to *Tel. Info.* AOB at 27-28. These cases, *United States v. Carpenter*, 819 F.3d 880 (6th Cir. 2016) and *United States v. Graham*, 824 F.3d 421 (4th Cir. 2016) (en banc), are similarly flawed. As in the Fifth and Eleventh Circuit cases, *Carpenter* and *Graham* addressed only historical CSLI generated by a defendant's active use of the phone. *Carpenter* explained at the outset that the data the defendants sought to suppress were business records created and maintained by the defendants' wireless carriers "when the defendants *made or received calls* with their cellphones." *Carpenter*, 819 F.3d at 866 (italics added). Later, the Sixth Circuit reiterated, "This case involves an asserted privacy interest in information related to personal communications." *Id.* It then explained that information regarding the manner in which one's communications travel from one point to another is not protected by the Fourth Amendment. Cellphone users "must know that, when she places or receives a call, her phone 'exposes' its location to the nearest cell tower and thus to the company that operates the tower." *Id.* at 887.

Similarly, in *Graham*, the Fourth Circuit was concerned only with historical

---

privacy concerns that an exception to the third-party-disclosure doctrine should apply to them, as it does to content, to prohibit undue governmental intrusion."

CSLI generated "when the Defendants used their cell phones *to make and receive calls and texts*." *Graham*, 824 F.3d at 425 (italics added). The activity challenged was the "records of the phone company that identify which cell towers it used to route Defendants' calls and messages." *Id*. Thus, the distinction drawn by the district court in *Tel. Info.* between that case and the Fifth and Eleventh Circuit cases is equally applicable to the Fourth and Sixth Circuit cases.

Moreover, Judge Wynn, joined by two judges, vigorously dissented from the majority opinion in *Graham*. Initially, the dissent noted that the array of dissenting and concurring opinions that had already been issued by federal appellate judges on this subject was an indication that the majority's holding was not mandated by Supreme Court precedent. *Graham*, 824 F.3d at 441 (Wynn, J., dissenting).[7] Judge Wynn then opined that cell phone users do not "voluntarily convey[]" historical CSLI within the meaning of the Supreme Court's third-party doctrine. As Judge Wynn explained, a "voluntary conveyance" occurs when a defendant knows he is communicating particular information and the defendant

---

[7]Judge Dennis dissented from the panel decision in *In re U.S. for Historical Cell Site Data*, 724 F.3d at 615. In *United States v. Davis*, 785 F.3d 598 (en banc), concurring opinions were filed by Judges W. Pryor, Jordan (joined by Wilson), and Rosenbaum and a dissenting opinion was filed by Judge Martin (joined by J. Pryor). Judge Stranch filed a concurrence to the panel decision in *Carpenter*, 819 F.3d 893.

acts in some way to submit the particular information. "The [Supreme] Court never suggested that the simple act of signing up for . . . a phone line, was enough to willingly turn over thousands of pages of personal data." *Id*. at 443.

According to Judge Wynn, a cell phone user is unlikely to be aware of his CSLI or that he is conveying it. In addition, "they surely do not know which cell phone tower their call will be routed through, a fact even the government concedes." *Id*. at 445. The third-party doctrine is also inapplicable, according to Judge Wynn, because "CSLI is automatically generated by the service provider's network, without any user participation at all." *Id*. A defendant's location will be recorded even when he does not answer a call made to his cell phone. *Id*. Finally, the dissent concluded that, "By acquiring vast quantities of Defendants' location information, spanning months, without Defendants' consent, the government infringed their reasonable expectations of privacy and thereby engaged in a search. Because the search was warrantless, it violated the Fourth Amendment." *Id.* at 448.

Judge Wynn's concerns were shared by Judge Martin in her dissent, joined by another judge, in *United States v. Davis*, 785 F.3d at 533. Judge Martin similarly rejected application of the third-party doctrine, explaining that cell phone users do not affirmatively make known their location data in order to make a call.

21

*Id*. at 534-535. More importantly, "blunt application of the third-party doctrine threatens to allow the government access to a staggering amount of information that surely must be protected under the Fourth Amendment." *Id*. at 535. That information "though not quite as precise as the GPS data in *Jones*, still revealed Mr. Davis's comings and goings around Miami with an unnerving level of specificity." *Id*. at 540.

The well reasoned dissents by Judges Wynn and Judge Martin demonstrate that the opinions from other circuits relied upon by the government are not only distinguishable from the instant case, but wrongly decided on their facts. The third-party doctrine is inapplicable, and individuals have a reasonable expectation of privacy in the historical CSLI generated by their cell phones.

In footnote 9 of its AOB, the government discussed the Sprint Privacy Policy and Terms and Conditions in effect in mid-2012. According to the government, these documents "expressly advised its subscribers (including Antonio Gilton) that location data was stored and shared with law enforcement." AOB at 30-31, n. 9. The government does not explain how these documents are made available to subscribers and fails to consider that the likelihood of a subscriber actually reading them is very small. Moreover, the documents are not as informative as the government suggests. A subscriber is told that Sprint

generally knows the location of a cell phone "when it is outdoors and/or turned on" and that location information is collected. However, a subscriber is not told specifically when such information is generated by his phone or how such information is captured by Sprint. Nor is the subscriber informed as to the level of preciseness regarding the location information that is collected or the length of time for which such data will be stored by Sprint.

In addition, the language quoted by the government from the Sprint Privacy Policy and Terms and Conditions does not expressly advise the subscriber that location information will be shared with law enforcement. A review of the Privacy Policy and Terms of Conditions suggests only two possible references to law enforcement receiving CSLI, both in the former. In the section entitled "USE OF PERSONAL INFORMATION," the Privacy Policy states that Sprint uses personal information of its subscribers "to do things like . . . Respond to legal process and emergencies." Later, the document states that "personal information or communications" may be disclosed to "comply with the law or to respond to lawful requests or legal process" during the course of business transfers or bankruptcies. Both these disclosures are a far cry from "expressly advis[ing]" subscribers that location data will be shared with law enforcement agencies conducting criminal investigations. *See* AOB at 31, n. 9.

23

In *Tel. Info.*, the government similarly relied on the service providers'

privacy policies to argue the absence of a reasonable expectation of privacy.

Judge Koh noted that "[t]he mere existence of a privacy policy . . . does not

dispose of the consent inquiry for Fourth Amendment purposes." *Tel. Info.*, 119

F.Supp.3d at 1036. In support of this point, *Tel. Info.* cited *City of Ontario v.*

*Quon*, in which the Supreme Court assumed that a police officer had a reasonable

expectation of privacy in the text messages sent on the pager provided to him by

the city, despite a city policy expressly stating that users have no expectation of

privacy or confidentiality when using such equipment. *Id*. (citing *City of Ontario*

*v. Quon*, 560 U.S. 746, 758, 760 (2010)).

Furthermore, Judge Koh reviewed the actual privacy policies of Verizon and

A.T. & T., the primary cell service providers from which the government wanted

to obtain CSLI in that case. These policies were very similar to the Sprint policy

relied upon by the government in this appal. According to Judge Koh, these

policies were "sufficiently vague as to the nature and scope of the CSLI sought

that subscribers [could] not be said to have consented to that information's release

to the government." *Tel. Info.*, 119 F.Supp.3d at 1038. The policies failed to

inform subscribers that "every call made or received, every text sent or received,

and every data connection will generate CSLI." *Id*. Nor did they mention "how

24

accurate the vaguely worded 'wireless location' information might be." *Id*. The policies also did not explain to subscribers "the length of time for which their location information will be stored." *Id*. Finally, the policies failed to "indicate the volume of location data that is likely to be collected and stored by the provider." *Id*. at 1039. The Sprint Privacy Policy and Terms and Conditions at issue here suffer from the same vagueness.

The government's analysis is further flawed because, unlike *Tel. Info.* and the *Graham* dissent, it fails to recognize that CSLI is generated without user interaction with the cell phone. The government emphasizes that the information seized pursuant to the warrant in this case was limited to CSLI relating "to calls made and received" by Gilton's cell phone. AOB at 14, n. and 39. As the government concedes, however, the record on this point was not developed in the district court. In addition, the government does not indicate whether the records it obtained related to incoming calls included CSLI generated only by calls Gilton answered or by both answered and unanswered calls.

In any event, the determination of whether a warrant supported by probable cause was needed to obtain historical CSLI should turn on what information law enforcement sought to obtain via the search warrant as well as what was potentially available to them, not on what data they ultimately seized. Here, the

25

warrant to Gilton's service provider did not seek only CSLI generated when Gilton was actively using the telephone. It was directed at all historical CSLI, regardless of how that data was generated. And, as found in *Tel. Info.*, cell-phone providers, especially Sprint, have the ability to collect CSLI created without user interaction. The search should not be found valid based on the limited nature of what the police ultimately seized, when the search was conducted pursuant to a warrant that was unlimited.

## C. The Government's Acquisition of CSLI Must Be Supported by Probable Cause, Not Merely a Showing of Reasonable Relevance to an Investigation.

The government argues that even assuming that law enforcement acquisition of CSLI is a Fourth Amendment search, a showing of reasonable relevance to an investigation, rather than probable cause, would satisfy the Fourth Amendment's reasonableness requirement. AOB at 40-45. This argument was not made to the district court, and is raised here for the first time.

The government's contention conflicts with the Supreme Court's longstanding admonition that warrantless searches are "'*per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" *City of Los Angeles v. Patel*, – U.S. –,135 S. Ct. 2443, 2452 (2015) (quoting *Arizona v. Gant*, 556 U.S. 332, 338 (2009)) (italics in original). The Supreme

Court has recognized that certain searches outside the scope of traditional law enforcement, or aimed at categories of people under circumstances where they enjoy reduced expectations of privacy, may not require probable cause warrants. *See City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000). As Judge Wynn explained in his *Graham* dissent, however, "none of the 'few specifically established and well-delineated exceptions' to that rule apply here.'" *Graham*, 824 F.3d at 448, n. 13 (Wynn, J., dissenting).

Here, no "special need" beyond normal law enforcement was served by the request for Gilton's CSLI. *Compare Maryland v. King*, 133 S.Ct. 1958, 1970 (2013) (state had significant interest in the identification of arrestees by using swab to obtain DNA sample from defendant's mouth). Nor did Gilton have a reduced expectation of privacy because of his status that justified rejection of the warrant requirement. *Compare Samson v. California*, 547 U.S. 843, 850 (2006) (parolees); *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646 (1995) (student athletes). The government's argument thus conflicts with longstanding precedent of the Supreme Court, and should be rejected.

The government is also wrong that the affidavit in support of the warrant for Gilton's CSLI "established reasonable grounds to believe that the records sought were relevant and material to an ongoing criminal investigation." AOB at 42. As

explained below, the affidavit was so deficient it failed to meet even this lesser standard.

### D. The Affidavit in Support of the Warrant Did Not Establish a Reasonable Nexus Between the Homicide and Gilton's CSLI.

The government argues that the district court erred in concluding that the warrant was not supported by probable cause. According to the government, the district court failed to accord appropriate deference to the judge issuing the warrant, ignored information contained in the supporting affidavit, and applied the incorrect standard by asking whether the affidavit provided sufficient evidence to incriminate Gilton, as opposed to whether it provided sufficient information to create a reasonable nexus between the homicide and the information sought. AOB at 46. As explained below, the government is incorrect on all grounds.

#### 1. Appropriate Deference.

As the Supreme Court has explained, the deference owed to the state court magistrate's determination of probable cause "is not boundless." *United States v. Leon*, 468 U.S. 897, 914 (1984). "[R]eviewing courts will not defer to a warrant based on an affidavit that does not 'provide the magistrate with a substantial basis for determining the existence of probable case.'" *Id*. at 915 (quoting *Illinois v. Gates*, 462 U.S. 213, 239 (1983)). There must be sufficient information

28

"presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." *Gates*, 462 U.S. at 239. Additionally, "[e]ven if the warrant application was supported by more than a 'bare bones' affidavit, a reviewing court may properly conclude that, notwithstanding the deference that magistrates deserve, the warrant was invalid because the magistrate's probable-cause determination reflected an improper analysis of the totality of the circumstances." *Leon*, 468 U.S. at 915.

Here, the district court granted appropriate deference to the state court magistrate's determination of probable cause. It conscientiously reviewed the sufficiency of the affidavit in support of the warrant in a commonsense manner to see whether there was a substantial basis for probable cause to search. *Gates*, 462 U.S. at 239 ("courts must continue to conscientiously review the sufficiency of affidavits on which warrants are issued"); *see also United States v. Krupa*, 658 F.3d 1174, 1180 (9th Cir. 2011) (Berzon, J., dissenting) (deference to a magistrate's probable cause finding "has never meant abdicating our role to ensure that the Fourth Amendment is respected.").

> 2. The District Court did not Ignore Information Contained in the Supporting Affidavit.

In conscientiously reviewing the supporting affidavit, the district did not

ignore evidence contained therein that supported a nexus between Sneed's killing

Gilton's cell phone. The district court noted that the affidavit "hardly mention[ed]

A. Gilton." ER 5. The only information about Gilton in the affidavit was that

L.G. described him as her "older brother," that she lived with him in Los Angeles,

and that his telephone number was one of those in L.G.'s cell phone. ER 5.

Significantly, "[t]he affidavit d[id] not even assert, or provide a substantial basis

for inferring, that A. Gilton was in the San Francisco area at the time of the

shooting." ER 5.

In the district court, as here, the government argued that "the totality of the

circumstances reflected in the affidavit 'pointed to the murder being a family-

based attack.'" ER 6. However, there was "no indication in the affidavit that A.

Gilton was in San Francisco at the time of the shooting, that he had any connection

to the parents' home nearby to where the shooting took place, or that he had

communicated with family members (or anyone else) about the girlfriend's

relationship with Sneed." ER 6. Moreover, "even assuming that the government

[was] correct that the facts stated in the affidavit supported a reasonable inference

of a 'family-based attack,' those facts pointed to one particular family member

being involved in the attack: B. Gilton, not A. Gilton." ER 6.

Nor did the affidavit contain "an opinion from an investigating officer

30

stating that, based on his or her experience in similar cases, he or she believed that

evidence of the homicide would be found in A. Gilton's cell phone data."  ER 7.

Rather, the affiant merely said,

> that "based on [his] investigation, there *appears* to be probable cause
> to believe that the cell phone numbers provided will tend to show
> [sic] *possible* first-hand knowledge of those persons responsible for
> the shooting of  the [sic] Calvin Sneed that took place in San
> Francisco on 12/20/11 [sic], and that the results of the [search and
> seizure] *could possibly* lead to the proper identity and the
> whereabouts of additional persons associated with this crime."

ER 7 (italics added).

The government argues that because Gilton was L.G.'s "guardian" in Los

Angeles, he was "likely involved in the efforts to extricate her from Sneed," and

that "Gilton could have been involved in the murder in multiple ways."  AOB at

49.  The warrant, however, never described Gilton as L.G.'s "guardian," just that

she lived with him in Los Angeles.  ER 415.  Nor did the warrant state that Gilton

attempted to get her away from Sneed, only that her mother came to Los Angeles

to persuade her to return to San Francisco.   ER 415.

While the affidavit contained information that more than one individual was

involved in the homicide, it contained no evidence as to the identity of that second

person.  In addition, contrary to the government's suggestion, the affidavit did not

indicate that every member of the Gilton family was involved in, or aware of, the

homicide, just that one family member, other than A. Gilton, was a participant.

The government further argues that there was coordination between someone in the family home and the shooter prior to the killing. AOB at 51, n. 12. That assertion is not supported by any information in the affidavit. But, even assuming that to be true, no information in the affidavit suggested that Gilton was at the family home prior to the shooting. The affidavit stated that Gilton lived in Los Angeles and did not indicate that he was visiting San Francisco at the time of the killing or that he ever came to San Francisco. ER 415. Indeed, as the district court pointed out, the affidavit contained hardly any information regarding the history or activities of the Gilton family. ER 6. Gilton's mere status as a family member did not create a reasonable nexus between the killing and his CSLI.

In sum, the government is unable to identify information beyond speculation to establish a substantial basis for the existence of probable cause.

3. The District Court Did Not Apply an Incorrect Standard When Reviewing the Supporting Affidavit.

The government accuses the district court of applying an incorrect standard when reviewing the affidavit in support of the search warrant. According to the government, the district court asked whether the affidavit provided sufficient information to incriminate Gilton, as opposed to whether it provided sufficient

information to create a reasonable nexus between the murder and Gilton's CSLI data.  AOB at 46.

The government misconstrues the district court's order.  At the beginning of its discussion regarding probable cause, the order clearly stated the appropriate standard: "'A search warrant is supported by probable cause if the issuing judge finds that, given all the circumstances set forth in the affidavit before him[,] there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  ER 5 (quoting *United States v. Underwood*, 725 F.3d 1076, 1081 (9th Cir. 2013)) (internal quotation marks omitted).

Moreover, the government fails to recognize that under the circumstances of the Sneed homicide, the question of Gilton's involvment in the offense is closely intertwined with the issue of whether there is likely to be evidence of the crime in the CSLI sought by the warrant.  In other words, if the affidavit did not establish probable cause that Gilton was connected to the homicide, it necessarily followed that the affidavit lacked probable cause that information relating to the homicide wound be found in Sprint records disclosing the whereabouts of Gilton's cell phone.  Significantly, the government never articulates what "useful information" was likely to be found in Gilton's CSLI, in the absence of any information establishing a nexus between Gilton and the homicide.

33

**E.** **The Affidavit in Support of the Warrant Was So Lacking in Indicia of Probable Cause That Reliance on the Warrant by the Police Was Not in Good Faith.**

The government's final argument is that even if the affidavit failed to establish probable cause the cell phone data should not be suppressed because the searching officers relied in good faith on the warrant. AOB at 51. However, when an affidavit in support of the warrant is so lacking in indicia of probable cause that an officer "could not have harbored an objectively reasonable belief in the existence of probable cause," the good faith exception does not apply. *Leon*, 468 U.S. at 923-26. Here, as the district court found, there was no "colorable argument for probable cause." ER 8. "[I]t was 'entirely unreasonable' to believe that the affidavit's passing, innocuous references to A. Gilton established probable cause to obtain his cell phone data." ER 8. Suppression of the CSLI is thus the appropriate remedy.

According to the government, "the affidavit plainly described a murder that grew out of a family crisis and suggested that Antonio . . . would have information that would have been vital to the parents." AOB at 53. The government's assertion, however, is not only entirely speculative, it misses the relevant point. It did not matter that Gilton, himself, might have information about L.G. that the parents desired. The relevant inquiry is whether Gilton's CSLI would contain

information related to the homicide. Nothing in the affidavit provided a substantial basis to believe that was the case.

The government's attempt to distinguish *United States v. Grant*, 682 F.3d 827 (9th Cir. 2012) is unpersuasive. In *Grant*, the Ninth Circuit found an absence of good faith where police relied on a warrant which laid out "no plausible connection" between Grant and the alleged crime. The police obtained a warrant to search Grant's home for a firearm used in a homicide nine months earlier. There was no indication that Grant had been involved in the homicide personally, but police suspected that his two sons had some connection to the murder.

The government conceded that the warrant lacked probable cause but argued that the police acted in good faith. The Ninth Circuit disagreed. There was "nothing in the affidavit suggesting that Grant had an independent connection to the homicide." Nor was there any ground for inferring that anyone involved in the homicide visited Grant's home. *Id*. at 836. While one son had visited Grant's house for a week, no information indicated that he had obtained the firearm or ammunition from Grant's other son. *Id*. at 836. At best, "the affidavit establishe[d] with any substantial degree of plausibility only two things": that the two sons were associated through gang affiliation, and that one of the sons matched "an extremely general description of the suspect." *Id*. Beyond that, "the

35

connections between the gun and Grant's house [we]re entirely speculative" and the officers' reliance was therefore "totally unreasonable." *Id*. at 839.

*Grant* is similar to Gilton's case because here, as in *Grant*, the affidavit established only that the person connected to the target of the search warrant. A. Gilton, was a relative of the person suspected of having committed the crime, B. Gilton. There was no evidence establishing an independent connection between A. Gilton and the crime under investigation, or even that B. Gilton had any interaction with him after the homicide occurred. In *Grant*, the Ninth Circuit found that the good faith exception did not apply. The same is true here because any connection between the homicide and Gilton's CSLI was based entirely on speculation.

The government's argument for application of the good faith doctrine is also defeated by the very language used by Sergeant Watts in drafting the affidavit. As explained above, Watt's failed to affirmatively stated that probable cause existed to obtain Gilton's CSLI. He wrote only that "there *appears* to be probable cause" and that it was only "*possible*," rather than fairly probable, that the search of Gilton's phone data would uncover evidence related to the homicide. ER 419-420.

The government further argues that it was reasonable for the officers to assume that if the magistrate found probable cause, at a minimum the facts in the

36

affidavit satisfied the lesser 18 U.S.C. § 2703(d) standard for a federal court order authorizing the collection of phone records.  AOB at 53.  The obvious problem with this argument is that the San Francisco police did not obtain, or seek to obtain, a court order from a federal judge under 2703(d).  Nor is there any evidence in the record that the San Francisco police were even aware of the lesser standard set forth in the federal statute.  Instead, the police relied in bad faith upon a state court warrant that was utterly lacking in probable cause.

The good faith exception applies when law enforcement reliance on a warrant is objectively reasonable.  *Leon*, 468 U.S. at 922.  There is no authority applying the good faith exception based on the existence of an alternative statutory procedure for obtaining court authorization for a search of CSLI, not actually utilized by law enforcement.

## CONCLUSION

For the foregoing reasons, the decision of the District Court granting Gilton's motion to suppress his CSLI should be affirmed.

DATED: October 27, 2016                    Respectfully submitted,

                                           /S/ Mark Goldrosen
                                           MARK GOLDROSEN
                                           Attorney for Defendant-Appellee
                                           ANTONIO GILTON

37

## STATEMENT OF RELATED CASES

Pursuant to Rule 28-2.6(a) of the United States Court of Appeals for the

Ninth Circuit, counsel for Appellee Gilton is aware of another interlocutory appeal

from the same district court case, *United States v. Williams, et. al.*, CA No. 15-

10475, which was argued and submitted on March 16, 2016.

DATED: October 27, 2016

        /s/ Mark Goldrosen       
        MARK GOLDROSEN
        Attorney for Defendant-Appellee
        ANTONIO GILTON

38

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed.R.App.P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, I certify

that Appellant's brief is proportionality spaced, has a typeface of 14 points or

more, and contains 8,363 words.

DATED: October 27, 2016

/S/ Mark Goldrosen
MARK GOLDROSEN
Attorney for Defendant-Appellee
ANTONIO GILTON